**EXHIBIT 4**

1:06CV01753

LEXSEE 1989 U.S. Dist. Lexis 14527

**BURGER KING CORPORATION v. WILLIAM C. STEPHENS and MELINDA C. STEPHENS, T.L.C.S., INC., T.L.C.S., II, INC., T.L.C.S., III, INC., and T.L.C.S., IV, INC.**

Civil Action No. 89-7691

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1989 U.S. Dist. LEXIS 14527

December 5, 1989, Decided; December 6, 1989, Filed and Entered

COUNSEL:
[*1]

Howard D. Scher, Esq., Stephen D. Ellis, Esq., MONTGOMERY, MCCRACKEN, WALKER & RHOADS, Philadelphia, Pennsylvania.

WILLIAM STEPHENS, MELINDA STEPHENS, T.L.C.S., INC., T.L.C.S., II, INC. T.L.C.S., III, INC. AND T.L.C.S. IV, INC. by: Mitchell A. Kramer, Esq., MITCHELL A. KRAMER & ASSOCIATES, Robert D. Greenbaum, Esq., Philadelphia, Pennsylvania.

OPINIONBY:
SHAPIRO

OPINION:

FINDINGS OF FACT and CONCLUSIONS OF LAW

NORMA L. SHAPIRO, UNITED STATES DISTRICT JUDGE

Plaintiff, Burger King Corporation ("BKC"), seeks a preliminary injunction to enjoin its franchisees, William and Melinda Stephens ("franchisees" or "Mr. and Mrs. Stephens"), from operating four restaurants located in the Philadelphia area. BKC claims that the franchisees conduct their business operations in a manner violating BKC's operational standards and causing BKC and the public immediate and irreparable harm. BKC alleges that defendants' actions constitute infringement of BKC's trademarks and service marks under the Lanham Act, the Pennsylvania Trademark Act and common law as well as breach of Mr. and Mrs. Stephens' franchise agreements with BKC. The complaint asks for treble damages, attorney's fees and a permanent injunction to enjoin [*2] defendants from using BKC's trademarks and service marks until defendants prove that the restaurants are free from pest infestation, comply with BKC operational standards and satisfy a follow-up BKC quality assurance audit.

After a hearing on the motion for preliminary injunction, the court makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 65(d).

Facts

1. BKC is a corporation organized under the laws of the State of Florida, with its principal place of business at 17777 Old Cutler Road, Miami, Florida.

2. BKC operates and franchises Burger King restaurants throughout the United States and abroad using the Burger King System ("BKC System") trademarks and service marks.

3. Defendants William C. and Melinda C. Stephens are individuals who reside in New Jersey. Defendants have leased and are franchised to operate the following four Burger King restaurants: No. 2491 located at 6601 N. Broad Street ("Broad Street restaurant"); No. 2922 located at 56th and Vine Streets ("Vine Street restaurant"); No. 3376 located at 58th and Baltimore Avenue ("Baltimore Avenue restaurant"); and No. 964 located at 448 E. Baltimore Pike ("Media restaurant").

4. [*3] The corporate defendants, T.L.C.S., Inc., T.L.C.S., II, Inc., T.L.C.S., III, Inc. and T.L.C.S., IV, Inc., are incorporated under the laws of the Commonwealth of Pennsylvania.

5. BKC filed a motion for a temporary restraining order and preliminary injunction on Friday, October 27, 1989 in the United States District Court for the Eastern District of Pennsylvania.

6. Defendants and counsel were served with copies of the Summons and Complaint, Motion for Temporary Restraining Order and Preliminary Injunction and supporting memorandum and affidavits on Friday, October

  

1:06CV01754

27, 1989.

7. There is subject matter jurisdiction under 28 U.S.C. § 1331, based on 15 U.S.C. § 1121, for the claims arising under the Lanham Act, 15 U.S.C. § 1114, and § 1125(a), as well as diversity jurisdiction under 28 U.S.C. § 1332. The court exercises ancillary and pendent jurisdiction over BKC's state law claims.

8 This court has jurisdiction over the parties; venue is proper under 28 U.S.C. § 1391(b).

BKC Trademarks

9. BKC employs and advertises throughout the United States certain trademarks and service marks ("BKC Marks") which identify the source, origin and sponsorship of BKC's facilities, products and services. [*4] All right, title and interest to the BKC Marks and the design, decor and image of the Burger King restaurants remain vested solely in BKC.

10. BKC operates company-owned Burger King restaurants and franchises Burger King restaurants nationally. BKC publicly advertises Burger King restaurants on television, radio and in print media. Franchisees must use the BKC Marks on products such as signs, logos, menu boards, posters, translights, uniforms, plates, cups, tray liners and other such items.

11. BKC's products bearing the BKC Marks are offered and sold in interstate commerce.

12. BKC has developed good will for the BKC Marks and for Burger King restaurants, products and services which bear the BKC Marks.

13. The public is familiar with BKC's Marks, and the products and services associated with the BKC Marks are understood by the public to be produced, marketed, sponsored, supplied or affiliated by or with BKC.

Franchise Agreements

14. On May 31, 1979, BKC entered into a franchise agreement with William Stephens ("Stephens") for the operation of the Broad Street restaurant. The franchise agreement granted Stephens a license for a period of twenty (20) years to use the BKC Marks [*5] and BKC system in the operation of the restaurant. Plaintiff's Complaint, Exhibit B.

15. On May 29, 1980, BKC entered into a franchise agreement with William and Melinda Stephens for the operation of the Vine Street restaurant. The franchise agreement granted Mr. and Mrs. Stephens a license for a period of twenty (20) years to use the BKC Marks and BKC System in the operation of the restaurant. Plaintiff's Complaint, Exhibit C.

16. On May 25, 1982, BKC entered into a franchise agreement with William Stephens for the operation of the Baltimore Avenue restaurant. The franchise agreement granted Stephens a license for a period of twenty (20) years to use the BKC Marks and BKC System in the operation of the restaurant. Plaintiff's Complaint, Exhibit D.

17. On January 14, 1986, BKC entered into a franchise agreement with William and Melinda Stephens for the operation of the Media restaurant. The franchise agreement granted Mr. and Mrs. Stephens a license for a period of approximately twenty one and one-half (21-1/2) years to use the BKC Marks and BKC System in the operation of the restaurant. Plaintiff's Complaint, Exhibit E.

18. Each of the franchise agreements are currently valid and [*6] binding on the parties.

19. Defendants currently have a valid and legal license to use the Burger King name and BKC Marks.

20. BKC built each of the four Burger King restaurants Mr. and Mrs. Stephens currently lease from BKC. N.T. II at 58, 61, 62. n1

  n1 Citation to the Notes of Testimony for hearings held by the court on plaintiff's motion for preliminary injunction will be as follows: October 30, 1989 ("N.T. I"); October 31, 1989 ("N.T. II"); and November 1, 1989 ("N.T. III").

21. Each franchise agreement requires the franchisee to adhere to BKC operational standards, including the procedures and specifications set forth in the MOD Manual, and to use BKC's restaurant design, color schemes, signage, interior decor, equipment systems requirements, menu and service format. Franchise Agreement, Section 4.

22. Each franchise agreement defines certain acts as events of default. The franchise agreement requires BKC to give the franchisee notice of the default and time to cure the default before the termination of the agreement based on the default. The cure period varies depending on the type of default. Franchise Agreement, Section 16.

23. Under each franchise agreement, BKC may terminate [*7] the franchise license if the franchisee fails to cure a default within the cure period specified or within 30 days of the notice of default if no period is specified. Franchise Agreement, Section 16A.

24. The franchisee's failure to maintain and operate the franchised restaurant in accordance with BKC standards and specifications as to service, cleanliness, health and sanitation or knowing sale of any product not





1:06CV01755

Case 1:06-cv-01492-EGS    Document 3-13    Filed 08/24/2006    Page 4 of 11

Page 3
1989 U.S. Dist. LEXIS 14527, *7

conforming to BKC's specifications is an act of default. The franchise agreement provides that the franchisee has five days after notification of a violation of BKC's operational, health or sanitation standards to cure the violation. Franchise Agreement, Section 16A(1).

25. Under the franchise agreements, the franchisee's right to use the BKC Marks and the BKC System terminates upon the termination or expiration of the franchise agreement. Franchise Agreement, Section 16B(1).

Lease Agreements

26. Stephens leases the premises where the four Burger King restaurants are located under lease agreements with BKC. N.T. II at 59, 61-2.

27. Events of default under the franchise agreements constitute grounds for termination of the lease, if they remain uncured. N.T. II at 80-1. [*8]

28. Defendants would be obligated under each lease to continue to pay rent to BKC even if the Burger King restaurant were closed. N.T. II at 79.

29. Defendants cannot operate any restaurant other than a Burger King at any of the leased locations without violating the terms of the lease. N.T. II at 80-1.

The Burger King System

30. BKC has established a uniform system of operational standards to regulate and control all aspects of Burger King restaurant operations by requiring adherence to detailed specifications set forth in BKC's Operations Manual, formerly Manual of Operating Data ("MOD Manual"). Plaintiff's Exhibit 7.

31. The MOD Manual prescribes rules governing food preparation and handling, procedures for receipt and storage of food products at acceptable temperatures, cleanliness, health, sanitation, customer service and employee training. Plaintiff's Exhibit 7.

32. BKC distributes a Restaurant Equipment Manual which sets forth operating, maintenance and cleaning instructions for restaurant equipment. Plaintiff's Exhibit 8.

33. BKC employs personnel to conduct periodic inspections of Burger King restaurants, including franchised restaurants, to ensure compliance with BKC [*9] operating procedures. Following inspections, Quality, Service and Cleanliness ("QSC") Progress Reports, evaluating the restaurant's compliance with BKC standards, are issued to the restaurant. The purpose of the QSC Progress Report is "to evaluate restaurant operations and [to] develop an action plan with the restaurant management team/franchisee to correct deficiencies." Plaintiff's Exhibit 7.

34. BKC's franchise operations manager Thomas Plantulli ("Plantulli"), conducted a QSC evaluation of defendants' four Burger King restaurants on September 18 and 21, 1989 and found numerous and serious deficiencies in each. In a letter dated September 22, 1989, Plantulli informed Stephens of the results of the QSC evaluations. Plaintiff's Exhibit 9.

35. The minimum acceptable grade on a QSC inspection is 80. The QSC scores from Plantulli's inspections of defendants' restaurants were as follows: Broad Street - 36; Vine Street-57; Baltimore - 44; and Media - 50. Plaintiff's Exhibit 9.

36. Following Plantulli's inspections, operations quality assurance manager Kenneth Fittz ("Fittz"), conducted an operations quality assurance audit at each of defendants' four Burger King restaurants.

37. An operations [*10] quality assurance audit evaluates food safety procedures based on an examination of equipment operating temperatures, sanitation, handling of in-process products, protection of product from contamination, pest infestation, food safety training, personal hygiene and product shelf life and rotation. The audit concludes with a consultation and recommendation for an "Action Plan" to ensure compliance with food service sanitation standards. Fittz Affidavit para. 4.

38. The quality assurance audit revealed numerous sanitary and operational standards violations at each of defendants' four restaurants. Fittz Affidavit.

Philadelphia Health Code

39. The Philadelphia Department of Public Health ("the Department") is authorized to inspect food establishments. Title 6 Philadelphia Code § 6-501.

40. The Department has the authority to suspend the operating license of a food establishment or to revoke the license. Title 6 Philadelphia Code §§ 6-503(2) and (3).

41. The Department has not suspended the licenses of the three restaurants within its jurisdiction (Broad Street, Vine Street and Baltimore Avenue). N.T. II at 71.

42. No BKC employee inspected the four franchises with a representative [*11] of the government agency responsible for issuing health certificates to the restaurants.

43. There are no outstanding health and safety violation orders against any of the four restaurants. There was no evidence of non-compliance with any order issued by a government agency to any of the four restaurants. N.T.

  

1:06CV01756

II at 71.

### Preliminary Hearing

44. The court inspected the four Burger King restaurants with counsel for both parties present on the following dates: October 30, 1989 (the Broad Street restaurant) and November 8, 1989 (the Vine Street, Baltimore Avenue and Media restaurants).

45. The court held hearings on BKC's motion on October 30, October 31, November 1 and November 8, 1989 after notice to defendants.

46. BKC presented the testimony of Plantulli, franchise operations manager; Fittz, operations quality assurance manager; Nelson Marchioli, operations quality assurance vice president; and Ronald J. Hertzberg, a food sanitation expert.

47. BKC produced evidence that defendants breached their franchise agreements and violated the Lanham Act, 15 U.S.C. § 1051 et seq., by conducting their business operations in a manner violating BKC's standards of operations and causing immediate [*12] and irreparable harm to its trademarks and service marks and to the consuming public.

48. Testifying on defendants' behalf were William C. Stephens; Troy Stephens, manager of the Broad Street restaurant; Joseph Lichtenstein ("Lichtenstein"), an expert on restaurant sanitation and quality control.

49. Based on his inspection of defendants' four restaurants on October 28, 1989, Lichtenstein testified that none of the restaurants presented health or safety hazards.

50. William Stephens is a named plaintiff in a lawsuit, pending in the United States District Court for the Southern District of Florida, on behalf of a plaintiff class of minority Burger King franchisees against defendant BKC for alleged racial discrimination. Hall v. Burger King Corporation, No. 89-0260 (transferred Jan. 4, 1989, S.D. Fla.) (Kehoe, J.). In the class action suit, the named plaintiffs allege that BKC restricts minority franchisees to economically marginal store locations through a practice of "redlining" in leasing and franchising. Defendants' Exhibit 2.

51. The plaintiffs in the Hall action filed a motion for a temporary restraining order to enjoin BKC from harassing minority franchisees by attempting [*13] to terminate their franchise agreements in order to impede their prosecution of the class action. Hall v. Burger King Corporation, No. 89-0260 (S.D. Fla) (Kehoe, J.); Defendants' Exhibit 4.

52. Defendants claim that BKC's action against them is part of BKC's attempt to deter prosecution of the class action by the Burger King franchisees who are named plaintiffs therein.

53. Defendants claim that BKC's new ownership no longer wants Burger King restaurants located in inner city areas.

54. Defendants assert that BKC violated the franchise agreements by failing to allow them an opportunity to cure the operational deficiencies noted at their four restaurants.

55. Defendants presented testimony that they have remedied most violations noted in the quality assurance audits and will correct the remaining deficiencies in order to bring the four restaurants into timely compliance with BKC's operational standards. N.T. II at 72, 76, 82; N.T. III at 10. untimely inspections were conducted immediately following September 30, 1989, when the last payment to BKC required by the June 21, 1989 settlement agreement had been made. N.T. II at 77-8.

### Broad Street Restaurant

63. As a result of the [*14] September, 1989 QSC evaluation by operations manager Plantulli, Fittz conducted an operations quality assurance audit at the Broad Street restaurant on October 17, 1989. N.T. I at 66.

64. The quality assurance audit at the Broad Street restaurant revealed widespread rodent infestation; improper food storage, handling and preparation increasing the risk of bacterial growth and food contamination; dirty and grease-covered equipment; deficient employee sanitation procedures; and general disrepair including a clogged urinal, dripping equipment and a hose extending into a sink improperly allowing for back siphonage. Back siphonage occurs when a decrease in water pressure causes a vacuum-like effect and siphons dirty water into the domestic water supply. Fittz Affidavit para. 6-19, Exhibits A and B.

65. Stephens received a written report of the inspection of the Broad Street restaurant on October 18, 1989. N.T. II at 74.

66. There was rodent infestation of the restaurant interior evidenced by rodent feces on hamburger buns, paper goods, plastic products and kitchen equipment near food storage areas and animal bite holes in plastic bags containing food products, particularly hamburger buns. [*15] Holes in the restaurant door and wall provide access to the restaurant interior by rodents and insects.

67. The court observed uncovered poison bait at the Broad Street restaurant, both in the public seating area and kitchen.

  

Case 1:06-cv-01492-EGS    Document 3-13    Filed 08/24/2006    Page 6 of 11

1989 U.S. Dist. LEXIS 14527, *15                                                                                    Page 5

68. The Broad Street restaurant was in a general state of disrepair. There were peeling ceiling tiles in the kitchen, a leaking urinal in the men's bathroom, uncovered drains, litter inside and outside the restaurant and dirt and grease on the cooking equipment. In addition, the court observed dirty, rancid water under the wet, rotting, wooden floor of the walk-in freezer.

69. Food and paper products were stored improperly; food products were left uncovered. Raw and cooked egg mix, dairy, chicken and sausage products were kept and cooked at temperatures above or below the range required.

70. The employees at the Broad Street restaurant lack adequate training in food safety techniques; there is no VCR machine or a videotape to train employees in basic food sanitation procedures as required by the BKC MOD Manual.

Vine Street Restaurant

71. Mr. and Mrs. Stephens were the original lessees of the Vine Street restaurant. N.T. II at 62.

72. As a result of the September, [*16] 1989 QSC evaluation at the Vine Street restaurant by operations manager Plantulli, Fittz conducted an operations quality assurance audit on October 18, 1989. N.T. I at 69.

73. The quality assurance audit at the Vine Street restaurant found roach infestation; inadequate employee hygiene; food storage equipment (holding chamber, refrigerator and freezer) operated at temperatures violating BKC's operating requirements; a potential back siphonage problem; filthy food storage areas and stagnant water puddles on the restaurant floor. Fittz Affidavit, paras. 31-37, Exhibits E and F.

74. Stephens received a written report of the inspection on October 27, 1989 when Fittz consulted Stephens about the problems regarding the Vine Street restaurant. N.T. I at 68; N.T. II at 74.

75. The court observed the presence of two rodents in the stacked flats of hamburger buns. Animal teeth marks on plastic and paper products as well as rodent feces were in evidence at the Vine Street restaurant. The court also observed a cockroach crawling into an uncovered drain near the drive-in window.

76. Dirt and grease covered the kitchen equipment at the Vine Street restaurant. The Vine Street restaurant was in a [*17] general state of disrepair with uncovered drains, uncovered overhead lights and litter.

77. The employees at the Vine Street restaurant had not been adequately trained in food safety and food handling procedures.

Baltimore Avenue Restaurant

78. Stephens was the original tenant at the Baltimore Avenue restaurant. N.T. II at 62.

79. As a result of the September, 1989 QSC evaluation of the Baltimore Avenue restaurant by operations manager Plantulli, Fittz conducted an operations quality assurance audit restaurant on October 20, 1989. N.T. I at 69.

80. The quality assurance audit at the Baltimore Avenue restaurant found rodent and insect infestation; equipment deficiencies in the refrigeration units and steamers resulting in food storage and preparation at improper temperatures; and several pieces of dirty equipment. Fittz Affidavit, paras. 38-43, Exhibits G and H.

81. Stephens received a written report of the inspection on October 27, 1989. N.T. I at 68; N.T. II at 75.

82. The Baltimore Avenue restaurant was fairly clean. The appearance of the Baltimore venue restaurant was better than that of the Broad Street and Vine Street restaurants in several respects.

83. The court did not [*18] observe evidence of rodent feces or animal markings on food products stored at the Baltimore Avenue restaurant.

84. The temperatures of the food storage equipment such as the walk-in freezer, shake machine and steamer did not violate BKC standards.

85. The cooking equipment was fairly clean and free from grease and grime.

Media Restaurant

86. BKC built the Media restaurant in 1978 and occupied and operated it as a company-owned restaurant until May, 1986 when Mr. and Mrs. Stephens acquired the franchise and lease for that location. N.T. II at 62.

87. As a result of the September, 1989 QSC evaluation of the Media restaurant by operations manager Plantulli, Fittz conducted an operations quality assurance audit on October 16, 1989. N.T. I at 65.

88. The quality assurance audit at the Media restaurant revealed defective cooking equipment causing food to be cooked at temperatures below minimum acceptable levels; food storage at unsafe temperatures; absence of a three-compartment sink for adequate sanitation procedures; dirty equipment; failure to observe holding time guidelines for food products; and a general disrepair of the restaurant. Fittz Affidavit, para. 20-30, Exhibits C and [*19] D.

89. Stephens received a written report of the inspec-





1:06CV01758

tion on October 17, 1989. N.T. I at 66; N.T. II at 72.

90. The court did not personally observe evidence of rodent or insect infestation in the restaurant.

91. The Media restaurant's kitchen area was relatively clean.

92. The restaurant's exterior was dirty and littered.

Walnut Street Restaurant

93. The court also inspected a Burger King franchise located at 40th and Walnut Streets (No. 2832) in Philadelphia on November 8, 1989 in order to evaluate claims of discriminatory treatment. The Walnut Street Burger King is owned by someone other than Mr. Stephens.

94. The Walnut Street restaurant was similar in appearance to defendants' restaurants. The court observed operational standards violations as well as dirty equipment at the Walnut Street Burger King. Although the violations at the Walnut Street Burger King were not as numerous as those at Mr. and Mrs. Stephens' restaurants, the conditions at the Walnut Street restaurant also raised concerns about health, sanitation and restaurant maintenance.

95. Notwithstanding the problems at the Walnut Street restaurant, it received an acceptable QSC rating. The average QSC score for [*20] the Walnut Street restaurant for the period from November 1, 1988 through October 30, 1989 was 82 percent. Plaintiff's Exhibit 10. Mr. and Mrs. Stephens' restaurants' average QSC ratings for the same period were as follows: Broad Street (No. 2491) - 48; Vine Street (No. 2922) - 48.3; Baltimore Avenue (No. 3376) - 56.9; and Media (No. 964) - 47.7. Plaintiff's Exhibit 10.

Discussion

To support a preliminary injunction, the moving party must prove reasonable probability of success on the merits and irreparable injury if the preliminary relief is not granted pending final adjudication on the merits. See American Greetings Corporation v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1140 (3d Cir. 1986). The district court must also consider the potential harm to the party opposing the preliminary injunction as well as the public interest. Id.

A. Probability of Success on the Merits

The hallmark of trademark infringement is confusion as to the source of a product or service in the public mind. Trademark law protects against the sale of goods consumers are likely to associate with an established, registered trademark. To determine whether a likelihood of confusion exists, a [*21] court may consider the following factors:

a. the degree of similarity between the owner's mark and the alleged infringing mark;

b. the strength of the owner's mark;

c. the good's price and other factors indicative of the care and attention expected of consumers when making a purchase;

d. the length of time that the defendant has used the mark without evidence of actual confusion arising;

e. the defendant's intent in adopting the mark;

f. the evidence of actual confusion;

g. whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

h. the extent to which the targets of the parties' sales efforts are the same;

i. the relationship of the goods in consumer's minds because of functional similarity; and

j. other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

Interpace Corp. v. Lapp Inc., 721 F.2d 460, 463 (3d Cir. 1978).

A likelihood of confusion entitles a trademark owner to injunctive relief. Id. at 462.

A licensor has a right to terminate a license to use trademarks [*22] when the licensee fails to meet the standards established by the licensor for products marketed under its trademark. Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc., 212 F.Supp. 715, 740 (E.D. Pa. 1962).

Plaintiff presented credible evidence of violations of BKC operational standards at all four restaurants. The QSC scores and deviations from operational standards, if not corrected to a minimal level of acceptability within a reasonable time, demonstrate that BKC would most likely prevail on the merits and obtain a permanent injunction preventing use of the trademarks until verified corrective action has been taken to the satisfaction of the franchisor. The conditions at the Broad Street and Vine Street restaurants were more than mere violations of unrealistic standards; they were deplorable, intolerable and indeed in some instances a likely threat to public health. The conditions were attested to by the regular inspector (Plantulli) and the special inspector for prob-

  

1:06CV01759

lem franchises (Fittz). The existence of the substandard conditions was corroborated by photographs in the case of the Broad Street restaurant and court inspection of all four restaurants.

Defendants contend [*23] they have not been provided the contractual 30-day cure period; this is correct in part. However, in deciding whether to grant preliminary relief pending final adjudication, the court must determine the likelihood of prompt, corrective action during a cure period. While some of the conditions complained of are readily correctable, others are not. It is clear that defendants will do whatever is easy and inexpensive to do in order to remedy deficiencies as promptly as possible. In fact, in response to the filing of this civil action and in anticipation of the court's inspection, much improvement was made in a very short time. The court credits Stephens' testimony that his current problems are to some extent a result of his wife's recent illness and that he has taken steps to correct some deficiencies and that he intends to deal promptly with others. But some problems are major and the corrective steps required will take an amount of time and money that Stephens was not even able to estimate. The court lacks confidence that defendants could or would correct these conditions within the foreseeable future. Whether Stephens lacks the will or wherewithal, whether he is over extended and [*24] lacks the ability to supervise four restaurants spread out over a large geographical area or whether market conditions do not permit sufficient profit to maintain the premises according to BKC standards in view of the BKC imposed overhead cannot be determined on this preliminary record.

Defendants' expert, an experienced restaurateur, testified that all four restaurants were not so bad, at least in comparison with the restaurant chain for which he was formerly responsible. This testimony although sincere was simply not persuasive. Because of the prompt hearing a motion for a preliminary injunction requires, defendants had a limited opportunity to prepare; therefore, the defense expert's inspection was cursory; he addressed certain complaints about temperature non-compliance (which he could not check for lack of temperature testing devices) by stating they were unimportant. However, the franchisees agreed by contract to comply with the standards of its franchisor, so the standards or experience of other restaurant chains is to a large extent irrelevant. Finally, in the rushed circumstances of his non-critical inspection, this witness failed to observe conditions still readily apparent [*25] to the court on later viewing the premises in person. Therefore, this expert testimony lacked credibility.

The record supports BKC's likelihood of success on its claim of violations of BKC's quality and safety standards, especially at the Broad Street and Vine Street restaurants. Failure to adhere to BKC operation standards would constitute a violation of the franchise agreements; BKC would be entitled to terminate defendants' right to use the BKC Marks. BKC has a reasonable probability of success on the merits of its claims for Lanham Act trademark infringement and breach of franchise agreements.

B. Irreparable Harm

Stephens' position as a Burger King franchisee and concomitant license to use the BKC Marks virtually guarantees that consumers will identify products sold at the Broad Street and Vine Street restaurants with BKC approved products. The Broad Street and Vine Street restaurant offer an identical selection of food in the same manner and at the same price as other Burger King restaurants. Like BKC, defendants target the market of consumers to whom the appeal of the speedy service of hamburgers and fries has enabled the term "fast-food" to become embedded in the American [*26] vernacular.

The cornerstone of the franchise system is the trademark or trade name of a product. Uniformity of product and control of its quality cause the public to turn to franchise restaurants. Susser v. Carvel Corp., 206 F. Supp. 636, 640-641 (S.D.N.Y. 1962); N.T. II at 126.

The franchisee/franchisor relationship allows the franchisee to sell Burger King products from a store of uniform and distinctive design that has as an integral structural feature the Burger King trademark erected on the roof as a prominent identifying mark.

The public's knowledge of the uniformity of operation and quality of product draws business to Burger King restaurants. Therefore, the name "Burger King" constitutes a trademark of great value to BKC and to the franchisees. BKC's inability to protect and insure the maintenance of the high quality of service that the marks represent would cause irreparable injury to BKC's business reputation and good will.

To the extent BKC is likely to prevail on the merits, it has demonstrated irreparable harm. If BKC is unable to control the nature and quality of the goods and services defendants provide at Burger King franchised restaurants, activities not meeting [*27] BKC standards at those restaurants could irreparably harm the goodwill associated with BKC's marks and BKC's reputation. Moreover, failure to meet some of the safety and sanitary standards here involved could subject BKC to substantial civil liability to members of the public personally injured thereby. Even though BKC is likely to prevail on the merits and accordingly can demonstrate

  

1:06CV01760

irreparable harm, the presence of other relevant factors requires that the preliminary relief requested be somewhat limited.

Defendants contended that similar operating conditions have been tolerated in white-owned and operated franchises and that the new standards target minority operators. For that reason, the court inspected a franchise operation at 40th and Walnut. Many of the conditions complained of by BKC existed there also; the overall compliance seemed greater than Broad Street and Vine Street but about the same as Baltimore Avenue and Media, although its average QSC was undeservedly much higher.

BKC claims a recent change in ownership has resulted in a program to enforce its standards more strictly. Defendants claim this is a subterfuge to eliminate minority franchisees, particularly in inner [*28] city minority residential areas. But there seems no question that by BKC standards, defendants' franchises received the lowest QSC evaluations in the Delaware Valley. Plaintiff's Exhibit 10. BKC is not required to act against all franchisees simultaneously.

Defendants' contention that BKC's action is in retaliation for Stephens' joining a class action against BKC, and that BKC's lack of good faith is demonstrated by the timing of this action is not without some apparent validity. Although the conditions complained of have existed for an extended period of time, BKC was willing to settle a prior eviction action by accepting installment payment of only a portion of sums allegedly overdue if defendants' agreed to keep current on franchise payments in the future. The last of the past due installment payments was made in September. Delay in instituting this action until a total of $125,804.67 had been paid suggests that BKC's concern about operating conditions is not genuine but an excuse to terminate defendants and destroy their standing as class action plaintiffs. In support of this contention, defendants presented evidence that BKC had proceeded similarly with regard to other class [*29] action plaintiffs.

The conduct with regard to third parties seems distinguishable and will be evaluated in the Florida class action. Based on its limited knowledge of the Florida class action, this court cannot agree that the grant of a preliminary injunction or final injunction, or the permanent termination of defendants' franchises (not sought in this action) will eliminate Stephens' standing to pursue damages for past racial discrimination, although it might affect entitlement to injunctive relief. The court cannot say that the pendency of the Florida action did not affect its decision in any way. In balancing the equities in regard to the preliminary injunction, the court has weighed the allegations of BKC's racially discriminatory conduct as well as its timing of this action.

C. Harm to Defendants

Closing these four franchised restaurants will cause substantial financial harm to defendants. Defendants' evidence was directed to the devastating financial effect of permanent and complete closure: claimed loss of a $2 million investment and default on loans in the amount of $384,000. While evidence of profit was lacking, it is likely that the franchises are somewhat profitable [*30] to defendants or they would not struggle to keep them; closing the restaurants would deny defendants income from sales although rental payments under the lease and certain loan obligations would continue. It is unlikely that defendants could be required to pay franchise fees such as advertising for restaurants that were not in operation, nor would it be necessary to meet employee payrolls if there were no employees.

The effect of temporary closure is more difficult to determine. In view of the transience of the employment market, no permanent harm to the employee complement from temporary closure can be foreseen. However, sales income would be eliminated for the period each restaurant would be closed and certain lease and franchise payments might continue to be due. If a restaurant is closed, there is not only loss of actual income but loss of patronage as well. There was no evidence of customer behavior regarding brand identification versus geographical convenience or competitive factors in the geographical areas of these franchises from which to predict what percentage of lost patronage would be regained immediately or eventually upon reopening.

The effect of partial closure was [*31] not contemplated by the parties and no evidence specific to such relief was presented. But obviously a closure of some franchises would limit income only in part and would be less harmful to defendants than a total closure. Temporary closure of some franchises would help defendants make necessary improvements by concentrating supervision efforts where the need is greatest. It would permit income from some franchises to provide the wherewithal to make the necessary improvements from substandard to satisfactory conditions.

Evidence of sales figures was limited and imprecise; there were total figures for funds invested but not the rate of return; the court cannot make either a cash-flow or profit analysis of each franchise operation. The financial harm to defendants has been sufficiently considered in limiting equitable relief to temporary closure of two of the four franchises where conditions necessitate temporary closure to ensure substantial compliance





1:06CV01761

Case 1:06-cv-01492-EGS     Document 3-13     Filed 08/24/2006     Page 10 of 11

1989 U.S. Dist. LEXIS 14527, *31                                        Page 9

with BKC operational standards. The Baltimore Avenue and Media restaurants may be brought into compliance without temporary closure but the Broad Street and Vine Street restaurants present a threat to public health and safety that weighs [*32] heavier than the detriment to the franchisee.

### D. Public Interest

Failure to maintain required quality standards constitutes an imminent threat to public health and safety. Filth and grease in proximity to open flames present a substantial risk of fire; improperly refrigerated dairy products may cause salmonella poisoning. The obvious evidence of mice or rat infestation (feces, rodent holes on paper covering and the observed presence of rodents in bread trays) cannot be credibly controverted

The court is mindful that the local regulatory agencies have not acted against defendants' operations. In the absence of evidence of recent inspection or agency notification, there can be no inference that the conditions have been or should be tolerated. The lack of proper enforcement of health codes enacted for the protection of the public does not mean that such conditions must be ignored when brought to the attention of a court. This court deems that it is required to inform the appropriate regulatory bodies of the charges made, conditions found and the decision of the court regarding preliminary relief so that a report of action or inaction by a board of health may be considered with regard [*33] to the issues of entitlement to permanent relief remaining to be determined on a more complete record.

On balance, in view of the likelihood BKC will prevail on the merits, at least in substantial part, and the possibility of irreparable harm to BKC pending final determination of the issues involved, factors that outweigh the financial harm to defendants, especially in view of the serious threat to public health and safety at some but not all of the franchised operations, a preliminary injunction will issue granting in part the relief requested.

Any facts stated in this section are incorporated in the preceding findings of fact as if stated therein.

### Conclusions of Law

1. The court has jurisdiction over the parties and the subject matter.

2. BKC has a reasonable probability of success on the merits of its trademark infringement and breach of franchise agreement claims.

3. BKC will be irreparably harmed by the persistence of substandard conditions at defendants' restaurants and BKC's inability to control the quality of the goods and services provided by defendants.

4. The financial harm to the defendants from the temporary closing of the restaurants is great.

5. The public interest [*34] in maintaining clean and sanitary restaurants as well as avoiding illness from contaminated food outweighs financial harm to defendants resulting from the imposition of preliminary injunctive relief.

6. The differences in the nature of quantity of operational and health violations between the Broad Street, Vine Street, Baltimore Avenue and Media restaurants justify the limitations imposed on the preliminary injunctive relief. Defendants will be ordered to close the Broad Street and Vine Street restaurants until there is reasonable compliance with BKC operational standards as set forth in the quality assurance audit action plans presented to defendants for those restaurants. The Baltimore Avenue and Media restaurants may remain open provided that defendants bring the restaurants into substantial compliance with BKC operation standards as set forth in the quality assurance audit action plans for those restaurants within a reasonable time.

  

1:06CV01762

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BASKIN-ROBBINS FRANCHISED SHOPS LLC, )<br>a Delaware Limited Liability Company, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CHAIROD RAUNGTRIPHOP and )<br>YUPIN RAUNGTRIPHOP, )<br>Both residents of the Commonwealth of Virginia, )<br>)<br>Defendants. )<br>) | C.A. No. _____ |

## ORDER

Upon consideration of Plaintiff's Baskin-Robbins Franchised Shops LLC ("Baskin-Robbins") Motion for a Preliminary Injunction, Defendants' opposition thereto, and the record herein; it is by the Court, this ___ day of _____, 2006,

ORDERED, that Plaintiff's Motion for a Preliminary Injunction be, and the same hereby is GRANTED; and it is

FURTHER ORDERED, that Defendants cease violating at Defendants' shop Baskin-Robbins' standards for health, sanitation, and safety as identified on the Quality Assurance Food Safety & Sanitation Inspection form dated July 31, 2006, attached hereto as Exhibit A, within five (5) days of the date of this Order.

_____
United States District Judge